# Horst, *et al. v.* Pake.

### Settlement of Receivership.

(Decided January 13, 1916.   Rehearing denied March 23, 1916.
71 South. 430.)

1. **Appeal and Error; Review; Presumption; Finding by Chancellor.**— Construing subdivision 1, § 5955 and § 6072, Code 1907, where the appeal is from a decree of the chancellor finding that an assignee was not guilty of such fraud or gross negligence as would deprive him of his right to compensation, and the register had found to the contrary on the reference held for that purpose, the facts are to be determined by the appellate court without any presumption as to the correctness of the finding of either the register or the chancellor.

2. **Equity; Reference; Fraud.**—The denial of compensation for a trustee because of fraud or gross neglect, like the question of the removal of the trustee on similar grounds, is a judicial question which the chancellor should

[Horst, et al. v. Pake.]

determine for himself, acting within his general equity powers, without necessity of reference or service of the register.

3. **Banks and Banking; Assignment; Compensation of Assignee; Removal.**—The fact that the removal of the assignee from his trust, because of the necessity, since his appointment, for bringing actions against certain stockholders, with whom the assignee was on intimate personal relations, to recover payment made by him to them as preferred creditors rendered it to the interest of the estate to entrust such matters to a disinterested trustee, does not have the effect to deprive the assignee of his right to compensation for services theretofore rendered, in the absence of a showing of bad faith, willful deceit or gross neglect.

4. **Same; Burden of Proof.**—Under § 6071, Code 1907, the burden is on the creditors of an assigning bank to show that its assignee, who has kept and made an ostensibly full and fair account of his acts, was guilty of fraud or such gross neglect in the execution of his trust as to be denied all compensation.

5. **Same.**—The evidence examined and held not to show any fraud or gross neglect by the appellee in paying as preferred claim deposits by stockholders which were the proceeds of dividends declared after the insolvency of the bank, and by a relative of the stockholder which was, in fact, an interest deposit made in the form of a general deposit to entitle it to preference, where those facts did not obviously appear on the books of the bank, but were only discovered after a thorough expert examination.

6. **Same; Compensation.**—Under § 6071, Code 1907, an assignee of an insolvent bank is not entitled to commission on securities which had been hypothecated by the bank with other banks, and which were collected by such banks and appeared on the assignee's books as cross entries; but the fact that the assignee claimed a commission on such collection does not require a disallowance of all compensation, no fraudulent intent being shown.

7. **Same; Settlement; Interest on Compensation.**—Under § 6074, Code 1907, an assignee of a bank under an assignment which authorized him to retain a reasonable compensation cannot be charged with interest on the 5% commissions retained by him from all collections, though not specifically authorized by the court to retain such commission, as would have been the better practice; such section, though relating especially to the powers of an assignee to sell real estate, being enacted in contemplation of the power of the court with reference to all powers granted by the deed of assignment.

8. **Same; Improper Payment.**—The assignee of an insolvent bank who paid claims held by certain stockholders as preferred creditors which were not entitled to preference, cannot be charged with attorney's fee in the suit to recover such payments from the stockholders, although made without strict compliance with the statutory requirements, where no fraud was shown in making the payments and there was nothing to show that they would not have been made had the statute been strictly complied with.

9. **Same; Charges; Undistributed Funds.**—In determining whether the assignee of an insolvent bank is chargeable with interest on undistributed funds, where there was no question as to the amount on hand, but the whole course of the administration was involved, the chancellor, and on appeal, the appellate court, can look to the whole record as well as to the register's report.

10. **Same.**—Where the assignee of an insolvent bank attempted to appeal from a decree removing him, and was granted supersedeas, he was not

chargeable with interest on the funds on hand prior to the dismissal of his appeal, as during that time he could not have made any payments to the creditors.

11. **Same.**—The assignee of an insolvent bank is not chargeable with interest on undistributed funds retained by him with permission of the court, after declaring a dividend which gave him a liberal, but not unreasonable, margin to meet certain uncalled for preferred claims, contested claims, a large undetermined claim of his counsel and the costs of administration yet to accrue.

12. **Same.**—By accepting payment of a dividend from the assignee of insolvent banks creditors do not waive their right to claims that the payment was unnecessarily delayed so as to charge the assignee with interest thereon.

13. **Same.**—Under § 6069, Code 1907, which was enacted after a decision holding that an assignee should not be chargeable with interest prior to twelve months after the creation of the trust, the assignee of an insolvent bank who failed to ask for an order for seventeen months declaring a dividend when the funds on hand were constantly increasing and should have paid 10% dividends seven and thirteen months previously and still have a safe margin, can be charged with interest on the amount of such dividend.

14. **Assignments; Benefit of Creditors; Duty of Assignee as to Dividend.**—An assignee of an insolvent bank cannot excuse delay in paying dividends on the ground that the creditors had not resorted to compulsory process against him.

15. **Same.**—While no hard and fast rule can be laid down as to when partial distribution should be made for the benefit of creditors by an assignee, dividends need be declared only when the collections suffice for a substantial reduction of the indebtedness of the estate with some regard for the cost and inconvenience of distributing a small sum among a great number of creditors.

16. **Same; Removal of Assignee.**—Where the assignee of an insolvent bank was removed because of his relationship to persons to whom he made payment as preferred claims which were not entitled to rank as such, but without fraud or gross neglect, he should not be allowed a commission on the funds turned over by him to his successor, who would also be entitled to a commission thereon, since the change of trustees were made necessary by his own situation.

APPEAL from Mobile Law and Equity Court.

Heard before Hon. SAFFOLD BERNEY.

Henry B. Pake was made assignee for the benefit of creditors of an insolvent bank, and was removed from the administration of the trust and Harry A. Horst was substituted as trustee. Upon the settlement between the trustees, the Chancellor sustained exceptions to the report of the Register denying the original trustee or assignee any compensation and the substituted trustee and some of the creditors appeal. Affirmed in part, reversed in part, and rendered in part.

[Horst, et al. v. Pake.]

GREGORY L. & H. T. SMITH, and CHARLES W. TOMPKINS, for appellant. HANAW & PILLANS, and ERVIN & MCALEER, for appellee.

SAYRE, J.—On March 20, 1911, the Leinkauf Banking Company, a corporation under the laws of this state, executed to appellee, Pake, a deed of general assignment for the benefit of its creditors. Three days later the assignee filed in the law and equity court of Mobile his bill for the administration of the trust, and on the same day the court made an order assuming jurisdiction. On January 27, 1913, after distribution had been made to preferred creditors, that is, to depositors who had not stipulated for interest, and after a reference had been held to hear and pass upon an account filed by the assignee, but before any action on the register's report had been taken by the court, certain nonpreferred creditors filed their petition alleging various derelictions on the part of the assignee, and praying that the matters covered by the account be referred again to the register, and that the assignee be removed. Upon this petition the court, on January 31, 1913, decreed a reference in accordance with its prayer, directing the register, among other things, "to take such further testimony as may be offered before him, relative to the question as to whether or not Harry B. Pake has faithfully performed his trust, and whether or not he should be removed from the further administration thereof and a successor appointed for further administration of said trust." It is to be observed of that part of this decree which we have quoted that, very properly, it merely directed the register to take evidence, not to report his conclusions as to its effect. The register, however, reported, among other things, his conclusion that appellee had willfully and fraudulently mismanaged his trust and should be removed. Among other things in this connection, his report included the following finding which we will quote at this point: "The register finds and reports to the court that at the time of the assignment there stood to the credit of Herman W. Leinkauf, who was president of the Leinkauf Banking Company, upon the books of that company, as a current deposit, the sum of $5,552.40; there also stood to the credit of the cashier of the bank, Alfred Proskauer, $1,609.01, as a current deposit; there stood to the credit of Rebecca Proskauer the sum of $10,156, as

[Horst, et al. v. Pake.]

a current deposit; and there stood to the credit of Mrs. Caroline Leinkauf, as a current deposit, the sum of $10,000. All of these accounts were paid by said assignee as preferred claims against the trust without question. The moneys paid to Herman W. Leinkauf, Alfred Proskauer, and Rebecca Proskauer as current depositors were erroneously paid to them, for the reason that said balances were made up largely of dividends declared by the Leinkauf Banking Company on the stock held by them while said company was insolvent, and each of said parties was indebted to said trust in sums much larger than their respective claims for dividends upon stock that had been fraudulently declared and paid to them as stockholders while the corporation was insolvent, and it was the duty of said trustee to have applied the balances shown to be due to them upon said current deposit accounts to the repayment of said fraudulent dividends as far as such balances would go. * * * In addition to this a large part of the said current deposit account of said Rebecca Proskauer consisted of moneys for which she held certificates of deposit drawing interest, but which had been carried into the current deposit account for the purpose of conferring upon her an apparent right of preference, although the Leinkaul Banking Company continued to pay her interest thereon. The $10,000 so paid to Caroline Leinkauf as a current deposit, but merely represented an indebtedness of said bank to the said Caroline Leinkauf for a certain note of the Vinegar Bend Lumber Company, which was purchased from her at its face value at a time when the Vinegar Bend Lumber Company was financially embarrassed, and the indebtedness thus created to the said Caroline Leinkauf placed to her credit as a current deposit because the bank did not have the funds with which to pay said amount and for the purpose of making her a preferred creditor."

There has been no admission as to the correctness of the foregoing finding so far as it undertakes to state purposes and motives, but its statements concerning the origin of the sums standing to the credit of the several accounts mentioned, the condition of these accounts at the time of the deed of assignment, the legal effect of the transactions thus shown, and the payment by appellee of these accounts as preferred, are admitted, and these things furnish the basis for the most serious charge brought against appellee, Pake. The register further reported his con-

[Horst, et al. v. Pake.]

clusion, the right and justice of which the appellee denies, that: "These payments, aggregating $27,317.41, were all made by the said Harry B. Pake as upon preferred claims in bad faith toward said trust and for the purpose of favoring and protecting the stockholders of an insolvent bank that had made an assignment, and the said Caroline Leinkauf, who is the mother of the said Herman W. Leinkauf, who, in turn, was the president of the Leinkauf Banking Company."

The register also reported his conclusion that the trustee had in bad faith or with gross carelessness violated his trust in other respects; that he should be removed; and that no compensation should be allowed to him for his services in administering the trust.

Complaining creditors then filed a separate motion for the removal of appellee from his trusteeship on the ground that he had violated his trust and was an unsuitable person to execute said trust, and upon the further ground that he had been guilty of gross negligence in the administration of his trust, and that thereby said trust had been put to great loss. Some account of what followed upon this motion may be found in *Ex parte Jones,* 186 Ala. 567, 64 South. 960, and *Pake v. Leinkauf Banking Co.,* 186 Ala. 307, 65 South. 139. Pake was removed and appellant Horst was appointed in his place; but the chancellor, as we find by consulting his opinion which has been incorporated in the transcript (*Wood v. Wood,* 134 Ala. 557, 33 South. 347; *National Foundry v. Oconto Water Supply Co.,* 183 U. S. 216, 22 Sup. Ct. 111, 46 L. Ed. 157), noting the fact that it had not been referred to the register to find or report whether the assignee should be removed because he had been guilty of bad faith or should be denied all compensation, but only to take and report the evidence touching those questions, referring to the fact that the books of the banking company on their face showed that these persons were current depositors to the amount of their respective current deposit accounts, stating his opinion that the reported evidence did not show that when the assignee made these payments he had any knowledge of the fact, found by the register, that these deposit accounts were made up in whole or in part of dividends which had been declared and paid to these persons on their shares of the capital stock of the banking company at times the company was insolvent, and finding that such knowledge was

obtainable by the assignee only by a close scrutiny into the affairs of the company prior to its assignment and into the solvency of its debtors, held that the evidence did not show that Pake had been guilty of bad faith, willful default, or gross negligence in the administration of his trust, and placed his decree of removal expressly upon the ground that, since it might become necessary to institute suit or take other steps to recover moneys belonging to the trust "which certain persons may have received wrongfully, and because of the assignee's intimate personal relations with these persons and the fact that his selection as assignee was due to them, it would be to the interest of the estate to intrust these matters to some other trustee." It was then referred to the register to state an account under sections 6070 and 6071 of the Code for the final settlement of appellee's administration. The register reported, charging the appellee with sundry items to be noticed hereafter, again finding that appellee had been guilty of fraud in his management of the assignment, and denying him any compensation on account of services rendered as trustee. The court, however, sustained exceptions to this report, and from that decree this appeal is taken.

(1, 2) We are of opinion that all the questions presented by this record come before us for original review on the evidence without presumption for or against the rulings of the judge of the law and equity court sitting as chancellor. Subsection 1 of section 5955 of the Code provides that: "In deciding appeals from the chancery court no weight shall be given the decision of the chancellor upon the facts, but the Supreme Court shall weigh the evidence, and give judgment as they deem just."

It has been deemed to follow from this statute that in the ordinary case the report of a register, although it has been disallowed or modified by the chancellor, comes before us on appeal attended by the same presumption of correctness that waited on it before the chancellor, and that it should not be disturbed here unless, that presumption to the contrary notwithstanding, it appears to us to be clearly erroneous.—*Pollard v. American Freehold Land Mortgage Co.*, 139 Ala. 183, 35 South. 767; *Andrews v. Frierson*, 144 Ala. 470, 39 South. 512. But for this case a different rule has been provided. This proceeding has been conducted under and by virtue of article 2 of chapter 145 of the Code relating to express trusts for the payment or security of

debts, and section 6072, a section of that article, provides that any action or conclusion of the register may be reviewed by the chancellor without any presumption in favor of the correctness of the action or conclusion of the register. And besides, so far as concerns the denial of all compensation to the trustee on account of bad faith and fraud, that broad question, like the question as to whether the trustee should have been removed for bad faith, fraud, or gross neglect, was one wholly judicial in character, not involving any necessity for the labors of the register as the court's accounting officer, and one which the chancellor, acting within his general equity powers, very properly, so far as procedure is concerned, determined for himself in the first place, subject sooner or later to be reviewed in this court under section 5955 of the Code, and we are not disposed to deny that in such determination the chancellor may not have properly taken cognizance of the entire history of the cause as shown by the record and proceedings in the cause. The same questions were raised upon the reference for a final settlement, by objections to the assignee's account, but we have not found that the evidence then taken shed any appreciable additional light upon the specific charge of fraud, bad faith, or gross neglect, against which the previous decree had found.

(3) It is urged in brief for appellant that the removal of the trustee was enough to justify and require the denial of all compensation. This would be true had he been removed for fraud, willful default, or gross negligence. As we have seen, this trustee was not removed on any such ground, but because his relations with the stockholders of the insolvent corporation, in view of the new question that had been brought into the case, rendered it probable that his feelings, and perhaps his interest also, would conflict with his duty in any action to recover dividends that had been paid to them as depositors; and it has not yet been adjudicated by any competent tribunal that he was guilty of fraud, willful default, or gross negligence. On this showing, without more, we think the assignee must be treated like a trustee who, for good reasons and of his own accord, asks leave to lay down his office.—*Matter of Rauth,* 10 Daly (N. Y.) 52.

(4) But it remains to inquire whether on the record before us it satisfactorily appears that appellee has been guilty of fraud, willful default, or gross neglect in the management of his trust.

[Horst, et al. v. Pake.]

It was the duty of the assignee to keep and make a full and fair account of all his dealings with the trust estate. Ostensibly, he has done this. Looking to the face of the account rendered and its own records, the court may deal appropriately with shortcomings and errors there appearing. But it is customary in this state to allow trustees reasonable compensation for services rendered to a trust where no express provision has been made, and under the statute governing express trusts for the payment or security of creditors, assignees are allowed the costs and expenses of administration, "including five per cent. commission to the trustee on the amount of money with which he is charged;" but, "upon application to the register by the assignee or any party in interest, such compensation of the assignee may be increased or diminished by the register for good cause shown."— Code, § 6071. We take it then that the attacking creditors assumed the burden of proof when, going behind the accounts rendered and the records of the court, they moved the court to deny all compensation on account of alleged misconduct. They must cause it to appear that the assignee was guilty of fraud or "such gross neglect in the execution of the trust, as to be evidence of a corrupt intention."—Smith v. Kennard's Executor, 38 Ala. 695, 702.

(5) It has already appeared that appellee filed his bill for administration of the trust under the direction of the court within 3 days of the execution of the deed of assignment. He did not, however, incorporate in his bill any statement of the value of the trust estate as shown by an appraisement, nor did he allege the names and residence of creditors, as contemplated by section 6060 of the Code. Under section 6058 the assignee has 10 days in which to prepare and file an inventory of property and a list of creditors. Section 6061 directs that on the filing of the petition for administration in chancery the chancellor must make an order designating a day, not less than 2 nor more than 12 months from the date thereof, by or on which day all claims against the trust estate must be presented, verified by affidavit. Objections to the allowance of any claim filed may be taken at any time within 3 months after the expiration of the time allowed for the presentation of claims.—Section 6066. The chancellor at first made no order fixing a time for the presentation of claims. But on March 29th, 9 days after the deed

of assignment, appellee filed an inventory and list of creditors, showing that, along with stocks, bonds, bills receivable and other property of the assignor, he had receive $53,382.84 in cash, and that the estate was indebted on current deposit accounts, preferred under the Constitution, in the sum of $193,403.64. The list of current depositors and their credits on the books of the bank showed as simple current accounts the items reported by the register in his report from which we have heretofore quoted. At the same time—that is, on March 29, 1911—appellee filed his sworn petition, to which the inventory was attached as an exhibit, stating in effect that the inventory and list had been correctly taken from the books, and praying that appraisers be appointed if deemed advisable by the court, that he be directed to exercise the powers conferred by the deed of assignment, subject to the control of the court, to the end that he might avoid delay by compromising and settling doubtful claims due the estate, asking for authority to pay a dividend of 25 per cent. to preferred depositors as they appeared upon the books, and that the register be required to publish notice in accordance with section 6062 of the Code. In the same petition the assignee offered to give such reasonable bond and security for the faithful performance of the trust as might be required by the court. This petition was signed by the assignee and by his attorneys, who no doubt prepared it. This petition was ordered to lie over for a day, and then the chancellor decreed that the assignee might exercise the powers vested in him by the deed of assignment, that notice be given for the filing of claims on or before June 10th, following, and that the assignee have leave to distribute ratably among the depositor creditors who had not stipulated for interest such portion of the cash moneys on hand as could be safely distributed at that time, provided there should be filed with him by each depositor an affidavit, to be by him filed with the register, showing the amount of such claim, and provided the same accorded with the books of the Leinkauf Banking Company in his hands. Between that date and the first of November, following, all uncontested current deposits shown by the books, including those appearing to the credit of Leinkauf, Proskauer, and others, supra, were paid in full, the distribution being concluded by a dividend of 35 per cent. These circumstances, which we have thought it well to state thus at length, show that, if ap-

[Horst, et al. v. Pake.]

pellee at any time conceived a scheme to defraud nonpreferred creditors by allowing Leinkauf, Proskauer, and others, rank as preferred creditors to which they were not entitled, the scheme must have been coeval with the creation of the trust.

The legal operation and effect of the order allowing this distribution was to leave upon the assignee full responsibility in the matter of determining whether persons to whom distribution should be made were in fact entitled to preference, and of that fact the face of the order carried notice to all parties in interest. It cannot be assumed that the court intended that it should operate differently; and if the proceedings from which it resulted were intended by the assignee to lead inquiring nonpreferred creditors to the belief that the status of all creditors claiming to be preferred depositors had been adjudicated and fixed by the court, it was a lame device. The decree, to the extent it gave color to the distribution, was ill-advised and premature in that it assumed the correctness of the books and approved distribution in advance of the time within which creditors might file objections. But if it be assumed that the assignee, though a knave, was not a fool, we should say that he would have known, certainly so after consulting his lawyer, that the course adopted, by its radical departure from that marked out by the statute, and the decree, which followed the prayer of the petition, but purported to adjudicate nothing at all, were more likely to arouse than allay suspicion, and were in any case ineffectual to forestall inquiry. It seems probable that an assignee, having plenary power under his deed of assignment to deal with the estate committed to him, and that without bond, if bent upon aiding and further concealing fraud, though it already lay behind a mass of bookkeeping, would not so promptly and of his own motion go into court with his trust and offer to secure the faithfulness of his administration. And it seems likely also that, if these proceedings were intended to cover fraud, they would have been made to conform, superficially at least, to the course pointed out by the statute. But however the thing were done, if it fell short of unearthing the wrongs that lay buried in the books, ingenuity would have been able after the fact to find objection to the manner of its doing.

Counsel who prosecute this appeal came into the case as heretofore stated in January, 1913. The motion then made to re-

open the account previously passed by the register and to remove Pake was evidently based upon information received from George T. Rosson, an expert in preparing the report of December 11, 1912, by making what the register referred to as "a critical examination" of the books of the bank. He was present when the motion was dictated by counsel, and made affidavit to the facts therein stated, and further deposed to his opinion that a thorough examination of the books would show that the bank had been insolvent at the time its last dividend was declared, within 90 days of the assignment, and during the 5 years next preceding that event. But nothing of these facts appeared in the register's report of December, 1912, unless they were blindly referred to in the closing paragraph, which was as follows: "Because of the fact that the ex officio register has not ascertained the assignee's solicitors' compensation, he is unable to declare a dividend on the net balance in the hands of the assignee at the time of the making of this report, and owing to the further fact that there are several claims which are contested and which are still undecided as to priority."

The record does not inform us in terms what contested claims of priority the register then had in mind; but we infer from subsequent proceedings, including Rosson's affidavit, that his reference was to dividends which during 5 years had been credited to the current deposit accounts of stockholders. In the same way we infer that, while the insolvency of the bank during that time was strongly suspected, a further examination by an expert, involving "enormous labor," would be necessary to develop full proof of the fact.

It is clear on these facts that the illegality affecting the preferences shown prima facie by the accounts standing to the credit of Leinkauf and others lay not at all near the surface of the books, and as yet there is nothing to show that appellee knew the fact upon which that illegality depended. It devolved then upon appellants to show that appellee, by his dealing with the estate after it came into his hands, evinced a desire to conceal these accounts from investigation, and thereby gave evidence of a previous knowledge of their true status.

After the ground of the attack upon these accounts had been developed, appellee testified on the reference ordered for a review of the first reference that he had never examined the books, ex-

cept to transfer the footings of the accounts there shown to the books he opened on taking charge. His idea seems to have been that he might take the books as he found them. This may be said to have demonstrated some undeserved confidence in the honesty of the bank's management, but the bank had enjoyed a good reputation, and we are unable to see in appellee's acceptance of its books as correct evidence of corrupt intent on his part. At the time he took over the affairs of the bank he employed one Lockwood, an accountant, for the limited purpose, as he testified, of verifying his transfer of the balances shown by the books of the bank. He testified, and this was not denied, that he did this at the suggestion of his counsel, and that these footings were made the basis of the first inventory filed with the register. But it is argued that he attempted to get a false certificate from Lockwood to the effect that he had audited the books which was to be presented to the court as showing a complete investigation and statement of all the affairs of the bank shown by the books. Lockwood was not satisfied to stop with this certification of appellee's books. He desired, and persisted in the effort, to make a complete audit. But appellee stopped him, saying that he had not been employed for that purpose. Lockwood then went for authority to the judge of the court in which the trust was pending; but the judge turned him away with the remark that he was Pake's employee. Nearly 2 years later, testifying as a witness at the review reference, Lockwood, stating his reasons for desiring to make a complete audit, said that it had occured to him that creditors would depend on his audit and that he should be perfectly free from interference. Another reason for his persistence and for the assignee's veto, aside from the contradiction as to the scope of his original employment, is suggested with considerable force by the fact that Rosson charged the estate more than $2,500 for the two examinations of the books afterwards made by him. Appellee subsequently spoke in his testimony of Lockwood's work as an audit; but meanwhile the books had been examined by Rosson, and if appellee's reference to Lockwood's work as an audit was inaccurate, it is difficult to see how, in the circumstances, he could have expected to mislead the court by that statement. Upon the whole we are impressed also with the idea that Lockwood's testimony, wherein it contradicts Pake, is not as definite and positive as we would

expect it to be had he at the time of the transaction conceived the notion, as he later intimated, that Pake was engaged in an effort to practice a fraud upon the court and the creditors whose interests were in his keeping. Some evident feeling had developed from the friction between Pake and Lockwood, and it appears to have found reflection in the latter's testimony.

Pake employed Leinkauf to assist him in his management of the trust. But there was no secrecy about that. Leinkauf is shown to have enjoyed a good repute as a business man, and we believe we can understand how his assistance may have been honestly and naturally considered as of great value in raveling out the complicated details of a business which showed balances of more than three-quarters of a million at the time of the assignment.

Long after Leinkauf and others had received their dividends in full as preferred depositors, after charges had been brought against the assignee, and after proceedings had been put on foot against Leinkauf and others to recover the dividends paid to them by the assignee and other dividends on stock they had received from the bank during its life, this assignee attended a conference between Leinkauf and others and their attorney in reference to their defense against the proposed proceedings. We do not know, except by this general reference to its purpose what passed at this conference. Pake admits his presence, but denies he took any part. We have no commendation for his course at that point, but it is not improper to consider that he was then charged as an accessory after the fact to the fraud charged against them, that necessarily the entire question of their liability was to be determined by what the books then in the possession of the register would disclose, or had already disclosed, in respect to the bank's insolvency during the period in which these dividends had been declared by the bank and passed to the current deposit accounts of its stockholders, and that concealment was then out of the question. Nothing remained but the legal aspect of the case, and probably that is what was discussed. His presence then at this conference had little or no bearing on the issue as we have stated it.

(6, 7) It is further charged that appellee claimed compensation on a statement of funds handled by him which was fraudulently swollen by the inclusion of amounts that had never come

into his possesion and by thus leading his counsel to prefer an excessive claim for their services rendered to the estate. This charge rests in the main upon the fact that as considerable quantities of the insolvent bank's securities, which had been hypothecated with creditor banks, were collected by those banks, these transactions were shown by cross-entries on appellee's books, and so with some other transactions of a similar nature, appellee claiming commissions on the total amounts thus shown to have been collected. It is not perceived that this claim by appellee sheds any appreciable direct light upon the question at issue, but we will state our conclusions as to its propriety. This was good bookkeeping, but not an allowable claim. Appellee's theory seems to have been that he was chargeable with the amounts thus shown, and hence entitled to commissions as "on the amount of money with which he is charged," as the statute puts it. Cases arising under statutes allowing administrators and executors commissions on receipts and disbursements or on money collected and paid out, some of which have been cited by appellants, are not strictly in point here because the language of the statutes applicable in the two classes is different. However, we think the statute in this case contemplates that the assignee shall be allowed commissions, eo nomine, only on moneys received, and fixes the commission at 5 per cent. Compensation, however, may be increased or diminished for good cause shown. The matter of the commissions in this case was submitted to the court on statements and claims, showing an exaggerated idea as to the amount of compensation to which the assignee was entitled, but in which we have been unable to find evidence of fraudulent intent, and the decree under review has made proper disposition of it to this extent at least: it disallowed any compensation in excess of 5 per cent. on moneys received.

(8) Pake retained and used amounts approximating 5 per cent. on collections as he went along. We find in this no evidence of initial or other fraud. But the matter needs some further statement. On the final accounting the register charged these amounts to the assignee with interest from the dates of their withdrawal. We presume this was done in pursuance of the register's opinion that the assignee had forfeited all right to commissions by misconduct. This ruling was overturned by the chancellor, and, for aught appearing, correctly so. The deed of as-

[Horst, et al. v. Pake.]

signment authorized the assignee to pay and retain to himself reasonable compensation, and by the order made at the outset of the case this right and power was left undisturbed in the assignee, not specifically, but by a general provision concerning the powers and privileges conferred by the deed of assignment. The concluding clause of section 6074 of the Code, though framed with special regard to powers of sale of real estate, was enacted in contemplation of the court's power to make such a decree to operate upon all the powers that may be granted by the deed of assignment. It reads: "But nothing herein contained shall prevent the assignee from exercising the powers of sale or other powers conferred by the deed of assignment, unless specially restrained from so doing by an order made in writing by the chancellor and filed in court."

It would have been the better course, nevertheless, for the assignee to apply to the court for leave to withdraw his commissions; but his withdrawals were not excessive, and in any event were subject to the court's approval as proper credits on final settlement. We have found no sufficient reasons for disallowing these commissions as of the dates of their withdrawal, and it follows of course that interest on them should not have been charged against the assignee.

On the general proposition that this assignee should not be allowed any compensation whatever on the ground that he was guilty of bad faith or gross negligence resulting in loss to the trust, we have been referred to several matters that appear, or are said to appear, in the evidence. We cannot further extend this opinion by a detailed discussion of these matters. We will state our conclusions in a general way. It is charged that there was negligence in the compromise of a large claim held by the bank against the Vinegar Bend Lumber Co., and in the management of a claim against Yll Vega & Co., of Santiago, Cuba, which was transferred to the assignee, by the Vinegar Bend Lumber Company, the proceeds to be applied to the debt of the company; that at one time this appellee questioned the right of the register to demand the production of the books of the bank; that some of the books were conveniently lost; and that this appellee was brought to Mobile for the purpose of aiding the officers and stockholders of the insolvent bank to perpetrate a fraud upon its creditors. After full examination of the record we have

found: That there is nothing to indicate that the claim against Yll Vega & Co., which was handled by appellee's attorneys at Mobile with the assistance of attorneys in Cuba, or the claim against the Vinegar Bend Lumber Co., then itself insolvent, could have been made by any degree of diligence to produce better results; that there was nothing vitally wrong in appellee's demurrer to the demand for the books, he referring the matter to his legal advisers; that while some of the books, of which there were a great number showing the business of the bank for many years, were left in the vault on the premises where the bank had carried on its business and were probably destroyed or otherwise disposed of by the landlord to whom the premises were delivered after a while, this was after the register had received such books as the expert Rosson at first thought necessary and such as were in fact enough to show the bank's business for 5 years next before the assignment, and under circumstances that may very well have led appellee to think that the old books and papers were of no account; that, as to the charge that appellee was brought to Mobile for the purpose of aiding a fraud upon creditors, this inference is drawn by appellants from the several circumstances to which we have heretofore adverted and from the following additional facts, viz.: That appellee was related by affinity to one of the attorneys of the bank, afterwards retained by appellee to advise him in the management of the assignment, the attorney being related by affinity to one of the stockholders, the stockholders being related by affinity among themselves. This no doubt accounted for appellee's selection as assignee by the owners of the bank, but it has not sufficed by itself or in combination with the other facts, to raise in our minds the belief that appellee was in the beginning given to understand the true nature of their accounts which on the surface of the books of the bank appeared fair enough. The circumstance of appellee's presence in Mobile at the time has been explained by a statement of facts that has not been contradicted. In short, the chancellor's reasons for his conclusion, appearing in our summary of his opinion, supra, are satisfactory to us, and we think the conclusion he reached on this branch of the case should not be disturbed on account of circumstances which may have called for a very careful investigation, but which at last appear to be consistent with reasonable diligence and honest purpose.

(9) The register charged appellee with $4,000, the reasonable compensation awarded to attorneys for appellee's successor for recovering from Leinkauf and others the payments above referred to and some other items of similar character. These other items, however, had not been carried into the current deposit accounts shown by the books at the time of the assignment, and appellee had made no distibution on their account. The whole recovery amounted to $30,000, a sum arrived at by compromise under an order of the court. Appellee's exception to this charge was sustained, and in this we are unwilling to say the court erred. There being in our opinion no evidence that appellee knew or had any reason to suspect what lay behind the accounts on which he made payment, their true status having been discoverable and discovered only after prolonged expert investigation, and it not appearing that the case in this respect would probably have been anywise different had the statute been followed to the letter, we have not seen our way clear to a holding that these moneys were temporarily lost to the estate by negligence deserving specific punishment. Appellee was not an insurer, and in view of all the circumstances we think it more reasonable to say that, so far as concerns this charge, appellee probably brought to the service of the trust that measure of diligence which an ordinarily prudent man bestows on his business transactions of a similar character.—*Alexander v. Steele*, 84 Ala. 332, 4 South. 281. We have found, therefore, that there was no error in allowing this fee to come out of the trust estate rather than charge it against the personal estate of the trustee.

(10) The register charged appellee with interest on average monthly cash balances in the hands of the assignee from November 1, 1911, a date shortly after the final dividend to preferred creditors, down to April, 1914, the month in which appellee's administration was terminated by the rulings of this court—this on the ground, we may assume, that there had been unreasonable delay in distribution to the nonpreferred creditors. As to this, the chancellor sustained appellee's exception to the register's report.

The propriety of this charge involved not so much a question as to any item of the account, for there was no dispute about the monthly balances, but involved the whole course and conduct of the assignment during the period in question; was a question of

broad equitable consideration arising out of the general management of the trust, and we have no doubt that the chancellor had the right, if he concluded the justice of the matter so required, to look to the "face of the proceedings" including the whole of the undisputed record before him as well as the register's report and the evidence noted in support of the exceptions thereto, as he did, and that we have the same right in final review.—*Faulk v. Hobbie Grocery Co.*, 178 Ala. 254, 59 South. 450.

(11) On November 22, 1913, the court rendered its decree removing the assignee for causes that have been stated. This decree required appellee forthwith to turn over to his successor all books, accounts, papers, money, and other remaining assets in his hands. From this decree appellee attempted to prosecute an appeal, the court below allowing a supersedeas; but this court held, April 14, 1914, that the order of removal would not support an appeal. Accordingly, April 21st, the court below vacated the supersedeas and ordered Horst to proceed with the administration. On April 25th, appellee complied with the terms of the decree. On these facts it is quite clear to us that appellee was properly relieved of any charge of interest for the time after the decree of removal. Indeed, he could not have made payments to creditors during that time without violating the terms of the decree.

(12) On November 1, 1911, appellee had on hand $35,432.98. By April 1, 1913, this cash balance, deducting commissions retained, had grown to $57,374.48. On April 25, 1913, he applied to the court for permission to declare a dividend of 20 per cent. At that time the estate owed an ascertained nonpreferred indebtedness of $175,429.79, not including $10,202.73 made up of amounts due to some preferred creditors who had not called for their dividends and some contested claims of preference. Objections taken by some of the creditors, that the petition did not sufficiently show the condition of the estate or whether a dividend of 20 per cent. was proper and sufficient, deferred action until May 7th when, the petition, having been amended by the addition of a schedule, the 20 per cent. dividend, amounting to $35,085.96, was ordered by the court. This left a balance on hand of $23,576.66 to care for the contested claims referred to above, and besides a large undetermined and contested claim of appellee's counsel for compensation, as well as court costs and

[Horst, et al. v. Pake.]

expenses of administration to accrue. The margin of safety thus reserved by appellee and allowed by the court, we will say without going further into the figures, was liberal, but not unreasonable in view of the condition of the estate at that time. We have therefore thought it proper not to charge appellee with interest for the period between April and November, 1913, during which the cash on hand, not including the amount of the dividend declared, was reduced to some extent by the excess of proper expenditures over collections.

(13-16) But whether the distribution applied for on April 25, 1913, was unduly delayed is another question, and we do not agree with the chancellor that creditors by accepting the dividend declared on May 7th, waived their right to complain of that delay or estopped themselves to contend on final settlement that the assignee should be required to pay interest down to the day of the dividend. During the 17 months between the last dividend to preferred creditors and the application to distribute among nonpreferred creditors the money on hand grew as we have stated. This money was not used by appellee, but it was kept on deposit with various banks with which appellee had had no previous relations, and the record is not without indications that during this time he was receiving favors from some of them on account of his large credit balances which otherwise would not have been extended to him. Appellee filed a statement of account on March 16, 1912, on which the register reported December 11th, following, the report to which we referred at the outset, and all along at intervals of 6 months, approximately, he filed supplemental statements; but at no time within these 17 months did he suggest distribution. The statute provides that the assignee shall account within 3 months after the expiration of the time allowed for the filing of objections to claims and every 6 months thereafter.—Code, § 6069. This statute, which was enacted after the decision in *Royall's Adm'r v. McKenzie*, 25 Ala. 363, in which it appears to have been considered that an assignee should not be charged with interest prior to the expiration of 12 months after the creation of the trust, was intended to expedite the settlement of trusts falling under its influence. It contemplates that the assignee must become the actor in proceedings for settlement and distribution, and that once at least in every 6 months an account must be filed in order that the con-

dition of the trust may be ascertained and its purpose, the payment of debts, accomplished to what extent it reasonably can in the circumstances appearing at each recurring period. The assignee cannot excuse delay on the ground that creditors have not resorted to compulsory proceedings against him. He has no right to keep money from creditors when by reasonable diligence he can secure an order for their benefit.—*Clark v. Knox*, 70 Ala. 607, 45 Am. Rep. 93; *Manhattan Cloak Co. v. Dodge*, 120 Ind. 1, 21 N. E. 344, 6 L. R. A. 369. No hard and fast rule can be laid down as to when partial distributions should be made. Each case must depend upon its own circumstances which are to be considered in the light of the plan and purpose of the statute. The assignee ought to be allowed a safe margin to cover contingencies, and on partial settlements we would say that dividends need be declared only when collections suffice for a substantial reduction of the estate's indebtedness and with some regard for the cost and inconvenience of distributing a small sum among a great number of creditors. After considering all the circumstances of this case our judgment is that the assignee should have applied for the allowance of dividends of at least 10 per cent. of the uncontested claims on or about the 10th of March and September, 1912. Interest will therefore be charged on the amounts such dividends would have produced from those dates respectively to April 25, 1913, the date of his application to the court for the allowance of a dividend of 20 per cent. This charge comes to $2,455.95.

(17) Appellee was allowed in the court below 2½ per cent. on $16,751.28, the amount he paid over to Horst, his successor in the trust. Horst will be entitled to commissions on this amount. Two commissions should not be allowed, and we see no sufficient reason for dividing the statutory commissions between them. The change of trustees and this delivery of funds to his successor having been made necessary by appellee's payment of dividends to Leinkauf and others as preferred creditors, the fund just here in question may be properly put in the same category with the sums paid to Leinkauf and others, upon which no commissions were allowed, although they came into the hands of appellee properly in the first place and were recovered to the trust by appellee's successor. Commissions are allowed upon collections or moneys received on the theory that they will be com-

[Johnson v. Johnson.]

pletely administered and applied in the payment of the debts of the trust estate. None should have been allowed on this fund which he was compelled by the awkwardness of his situation to deliver unadministered to his successor, a situation for which nobody but himself was in the slightest degree responsible. This commission amounted to $418.78. The total error in the decree in favor of appellee amounted to $2,874.73. A decree will be here rendered as of this day against appellee and his bond for this sum in favor of his successor in the trust.

Affirmed in part, reversed in part, and rendered.

ANDERSON, C. J., and McCLELLAN and GARDNER, JJ., concur.